## CONTINENTAL & COMMERCIAL TRUST & SAVINGS BANK v. NEW ORLEANS DRAINAGE CO. et al.

(District Court, E. D. Louisiana. January 25, 1922.)

### No. 14852.

Corporations ⬤⟲479—Mortgage trustee cannot acquire bonds secured to detriment of other bondholders.

A bank which, after having accepted the position of trustee in a trust deed securing bonds to be issued by a corporation having neither capital nor assets, organized to exploit a tract of swamp land on which one of the organizers held an option to purchase, became in effect a partner in the scheme by approving, through its president, who knew all the facts, a circular advertising the bonds which contained false and misleading statements, and by lending money to take up the option, which would otherwise have lapsed, taking as security the unsold bonds, some of which it knew had been authorized expressly for a different purpose, and through sale of the collateral becoming owner of such bonds, *held* to have violated its duty as trustee for the other bondholders and entitled to participate in the proceeds of the property when sold on foreclosure of the trust deed only on the basis of the actual cash it had contributed.

In Equity. Suit by the Continental & Commercial Trust & Savings Bank against the New Orleans Drainage Company and others, with Wellington R. Burt and others as interveners. On exceptions to master's report on distribution of fund. Confirmed as to essentials, and decree accordingly.

Mayer, Meyer, Austrian & Platt, of Chicago, Ill., and Milling, Godschaux, Saal & Milling, of New Orleans, La., for complainant.

Carl V. Wisner, of Chicago, Ill., and John D. Miller, of New Orleans, La. (Wisner & Walsh, of Chicago, Ill., of counsel), for interveners.

FOSTER, District Judge. In this case it is difficult to extract the facts from the record, as part of it was destroyed in a fire that consumed the office of the special master appointed in the case. Counsel have attempted to supply the deficiency, but several material documents are missing. However, there is very little, if any, dispute as to the material facts hereinafter stated. Arranging them somewhat chronologically they are these:

In 1908–1909 John Stuart Watson was a depositor in the American Trust & Savings Bank of Chicago, hereafter referred to as the Bank, and personally acquainted with its president, Edwin A. Potter.

In September, 1909, W. R. Reynolds and John Stuart Watson organized a corporation known as Reynolds, Watson & Co., with a capital stock of $20,000 each owning one-half, with Reynolds as president and Watson as vice president and treasurer. The business of the corporation was dealing in stocks and bonds.

In February, 1910, Watson, acting for Reynolds, Watson & Co.,

secured an option on 34,057 acres of land within the corporate limits of New Orleans, La., known as the Michaud tract, for $410,000 cash, and $10,000 was paid on account. This land was low and swampy, and could only be made fit for cultivation by drainage through leveeing and pumping.

In March, 1910, Watson took up with Potter the question of floating a bond issue on the Michaud tract, with the Bank as trustee. The details of the proposition were fully discussed, and the Bank agreed to act as trustee.

On March 29, 1910, the New Orleans Drainage Company, hereafter referred to as the Drainage Company, was organized under the laws of Louisiana by Watson, with an authorized capital of $2,500,000, of which only $3,000 was subscribed. It does not appear that any stock was paid for.

A deed of trust was then prepared under the supervision of the Bank's trust officer, Mr. Koff, dated May 2, 1910, whereby the Drainage Company mortgaged and hypothecated the Michaud tract to secure an issue of $2,500,000 of 6 per cent. bonds in denominations of $500 and $1,000, maturing on various dates, interest payable semiannually on May and November 1st. This deed was acknowledged before a notary in Chicago, May 12, 1910, and was deposited in New Orleans in the office of a notary, and presumably recorded on June 21, 1910.

The trust deed is expertly drawn, with all the usual clauses touching default, etc., and in substance recites that the Drainage Company then owned the Michaud tract; that the grantor was desirous of issuing at once $750,000 of bonds, for the purpose of completing payments for the property; that $500,000 of the bonds were to be issued for the purpose of securing the payments of indebtedness incurred, and to be incurred, for developing and improving the property; that the land, describing it, and the entire system of improvements for reclamation now or hereafter upon the property, giving details, was conveyed to the trustee; that the trustee shall have the right to acquire the bonds secured by the trust deed. Only $1,250,000 of bonds were issued.

In April, 1910, before the trust deed was executed, Reynolds, Watson & Co. issued a circular offering $1,250,000 of the bonds for sale. This circular stated $2,000,000 stock had been issued, that the Drainage Company owned the land, and named the Bank as trustee. The circular contained a letter dated April 4, 1910, addressed to Reynolds, Watson & Co., signed by the Drainage Company, Warren B. Reed, President, giving a glowing account of the project. The letter starts with the sentence, "Referring to your purchase of 1,250,000 of the first mortgage 6 per cent. bonds of the New Orleans Drainage Company," and the whole tenor of the letter would indicate that the work of leveeing and draining the tract was then well under way, and that a large portion would be drained and ready for cultivation in about a year's time. This circular was sent to Potter, president of the Bank, before it was issued, and he and Watson discussed it. Reynolds, Watson & Co. then began to sell bonds, generally at 90, and with a stock premium. No bonds were paid for or delivered for some time.

The option on the property expired May 30, 1910. Bonds did not sell

as rapidly as anticipated, and in May, 1910, Reynolds and Watson began negotiations with Potter to borrow money to close the deal. On May 20, 1910, Watson, as treasurer of Reynolds, Watson & Co., wrote to Potter, as president of the Bank, proposing to borrow $400,000 to complete the purchase of the land and to pledge all of the bonds to be issued—$1,250,000, less $25,000, maturing in 1920—as security. He also stated he had sold $173,000, par value, of bonds, and expected to sell $425,000 additional bonds within 30 days. Potter investigated the value of the land and the financial responsibility of the purchasers of the bonds, and agreed to make the loan. It was agreed that, as bonds were paid for, the amount was to be credited on the loan until its liquidation.

The Bank then took charge of completing the deal. Koff came to New Orleans with Watson. The cash was paid to complete the sale to Watson, and Watson executed a deed to the Drainage Company on May 28, 1910. This deed is not in the record. However, the details have been supplied by counsel from the public record. It recites a conveyance from Watson to the Drainage Company for $410,000 cash and "other valuable consideration," without enumerating the "valuable consideration." The minutes of the Drainage Company are not in the record. There is evidence to the effect that Watson was to receive $730,000 in bonds and $2,000,000 in stock for the land.

Koff and Watson returned to Chicago immediately. The note had been executed by Reynolds, Watson & Co., by Reynolds, in Chicago on May 28, 1910. It is not in evidence, but it must be assumed it contained a pledge of the bonds and gave the pledgee the right to purchase them after default on the note. Letters were written by Reed, president of the New Orleans Drainage Company, authorizing the Bank to deliver the entire issue of bonds to Watson. The Bank made a technical delivery, by transferring the bonds from their trust department to their banking department as security to the note, except as to $25,000 of the bonds delivered to Watson. At this time the Bank had on deposit $131,970, received in payment of bonds. This was subsequently increased to over $188,000. These payments were credited on the note.

In September, 1910, Watson received from the Bank $12,000 of the bonds which he sold, and the proceeds were applied to payment of interest on the coupons maturing November 1, 1910, and to a reduction of the loan. No more bonds were sold. In September, 1910, Watson turned over to the Bank $1,002,000 stock of the Drainage Company as additional collateral on the note.

Before May, 1911, Watson again applied to the Bank for additional bonds to be sold to take care of the May interest, but was refused delivery. There is evidence tending to show that the parties contemplated setting aside $150,000 of bonds to take care of interest during the period of development. This is denied by the Bank. The May coupons were not paid. From January, 1911, up to June, 1913, Watson and the Bank officials had many conferences looking to a reorganization of the Drainage Company, and it was sought to interest other persons, but all without result. Nothing was done to improve or develop the land.

In June, 1913, the board of directors of the Bank ordered foreclosure

proceedings. Reynolds, Watson & Co. filed suit in the United States District Court for the Northern District of Illinois to enjoin the Bank. The suit went against them; the bonds were sold under order of court, and were bought in by the Bank for $250,000, which was less than the debt. The transcript of these proceedings is not in the record. In the meantime the Bank's name had been changed from American Trust & Savings Bank to Continental & Commercial Trust & Savings Bank. On December 2, 1913, the Bank, as trustee, filed its bill to foreclose the mortgage on the land.

The other holders of bonds intervened in the proceedings, contending that the interest of the Bank should be restricted to the actual money advanced by it, and incidental questions were vigorously litigated. However, in course of time a sale was ordered, and on May 19, 1915, the land was sold to Walter J. Engle, acting for the Bank, for $200,000. Ten per cent. of the price was deposited with the master, final payment of the balance to await a determination of the respective equities of the bondholders. The sale was confirmed on June 11, 1915, and the matter referred to W. Morgan Gurley, Esq., as special master, to determine the distributive share of each bondholder.

After considerable delay, not attributable to anybody in particular, however, the master filed his report on June 27, 1921. The master found in substance that the Bank had entered into a partnership with Reynolds, Watson & Co. to promote the project to reclaim the Michaud tract, and that its pro rata distribution of the amount received from the foreclosure sale should be based on the amount of money it actually contributed to the purchase price. The master also made findings as to interest and attorney's fees. Practically all of the master's report was excepted to by the Bank, and the matter was submitted in December, 1921, on the exceptions.

Quite a number of decisions have been cited by each side, but it is not necessary to review them. It is elemental that a trustee, named in a deed of trust securing a bond issue, represents all the bondholders and is held to the greatest good faith. It may be conceded a trustee may purchase the bonds in the usual course of business, when permitted by the provisions of the trust deed, provided no breach of trust is involved thereby.

In this case the Bank stepped far outside of the character of trustee. With its knowledge and consent, its name and high financial standing was used to induce the public to invest in securities having very little substance. The Bank knowingly permitted the promoters to issue a circular teeming with untruths. The Drainage Company did not own the land. Reynolds, Watson & Co. did not own the bonds. The Drainage Company had absolutely no resources. The land was merely a swamp. No development had been started. No development could ever be started, except with the money obtained from the sale of bonds. As a practical proposition, the Drainage Company could sell no bonds until Reynolds, Watson & Co. had first earned their speculative profit. It was practically impossible for the Drainage Company to sell stock. Four-fifths of its entire authorized capital stock, $2,000,000, had gone to Reynolds, Watson & Co. The $500,000 of stock remaining in the treasury was worthless. What the Bank should have done was to let

Reynolds, Watson & Co. work out their own salvation. Had they done so, the intervening bondholders would have had their money returned to them intact. The position assumed by the Bank was entirely inconsistent with its duty as a trustee.

Going further, $500,000 of bonds, by the express provisions of the trust deed, were to be sold only to raise funds to levee and drain the land and otherwise develop it. Reynolds, Watson & Co. had no right, title, or interest in these bonds. The Bank knew this when it received them in pledge. The Bank also knew that, by receiving these bonds in pledge and retaining them, it defeated the very purpose for which the Drainage Company was organized. This was also inconsistent with its duties as trustee.

With regard to the agreement to release $150,000 of bonds out of the $750,000 belonging to Reynolds, Watson & Co., the conflict of testimony must be resolved against the Bank. The Bank knew the Drainage Company would have no money to pay taxes and interest for several years. The $500,000 of development bonds could not be used for that purpose. Taxes had to be paid in any event, if not by the Drainage Company, which had nothing, then, of course, by the Bank to protect its pledge. It was reasonable and logical, therefore, that the Bank should have so agreed. This is strengthened by the fact that, when the first installment of interest came due in November, 1910, the Bank did release $12,000 of bonds, which were sold mainly to pay interest. When the Bank refused to release additional bonds to pay the May interest, it precipitated a default and the subsequent foreclosure. This was inconsistent with its duty to the bondholders which it represented.

The Bank knew the facts, and the bond purchasers did not. The intervening bondholders lived hundreds of miles from New Orleans. In the face of the positive statements in the circular that the company owned the land, and Reynolds, Watson & Co. had bought the bonds, thereby indicating the company had ample funds for development, ordinary prudence did not require intending purchasers to make an investigation of the public records in New Orleans. Had they examined the trust deed, they would have found statements confirming the circular. Considering the high standing of the Bank, it is reasonable to conclude that bonds were purchased largely on the faith of the Bank's being trustee.

No charge of actual fraud is made against the Bank. Its action may be attributed to overzealousness to have a transaction with which its name had become linked terminate successfully; but in exacting a pledge of practically all the outstanding bonds in order to amply secure itself, the Bank overlooked its duty to the other bondholders whom it represented in a fiduciary capacity. The Bank should not profit to the prejudice of the interveners.

On the whole case, the conclusion of the master that the Bank should participate in a distribution of the amount realized from the sale of the land only on the basis of the amount it contributed to the purchase price in actual cash was right. The exceptions to that part of the report will be overruled.

In passing on the question of interest the master has filed an elaborate schedule, and seems to have allowed the Bank interest at 5 per cent. per

annum, and allowed the intervening bondholders interest at 6 per cent. per annum, compounded semiannually, up to March 1, 1921. The allowance of 6 per cent. interest to the bondholders, compounded semiannually, would be in accordance with the terms of the mortgage, had there been no default on the principal of the bonds and no foreclosure. The method of computation of interest and the date to which it is allowed are comparatively unimportant, however, as the Bank and the interveners must be treated alike. In equity, the decisions with regard to the date to which interest should be computed vary according to the equities in the cases. The rule in bankruptcy is well settled. Interest is allowed to the date of the sale, regardless of when the creditor is paid. Sexton v. Dreyfus, 219 U. S. 339, 31 Sup. Ct. 256, 55 L. Ed. 244. It will be equitable to follow the same rule in this case.

After paying costs and charges admitted due and not objected to, the Bank should recover a distributive share, based on the amount it contributed to the purchase price of the land, with 6 per cent. per annum interest. In addition, the Bank should recover the amount of expenses and taxes it advanced prior to the date of sale, with legal interest, 5 per cent. per annum. The Bank should also participate equally with the other bondholders for the par value of any bonds acquired by it from third persons subsequent to the purchase of the property.

The confirmation of the sale on June 11, 1915 passed the title to the land, the execution and delivery of formal deeds being a mere detail; therefore the Bank is not entitled to recover for any taxes assumed at time of sale or paid subsequently. The intervening bondholders are entitled to participate on the basis of the par value of the bonds held by them with interest at 6 per cent. per annum. All interest to be computed up to June 11, 1915, and no further.

The master allowed the attorneys representing the intervening bondholders a fee of $1,000, to be charged against the fund. No objection is made as to the amount, but it should be charged against the share of the interveners. To the extent above indicated the master's report will be disapproved, and the exceptions thereto, so far as pertinent, will be sustained. There will be a decree accordingly.